# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

### TEXARKANA DIVISION

| | | |
|---|---|---|
| **JIMMY MITCHELL,** *et al.* | § | |
| | § | |
| *Plaintiffs,* | § | **Civil Action No. 5:15-CV-19-JRG** |
| **v.** | § | |
| | § | |
| **PILGRIM'S PRIDE CORPORATION,** *et al.* | § | **JURY TRIAL DEMANDED** |
| | § | |
| *Defendants* | § | |
| | § | |

## FIRST AMENDED COMPLAINT

Plaintiffs Jimmy Mitchell, LaShaunda Boyd, Carla Brooks, Antoinette Brown, Chris Burns, Richard Hearn, Kristi King, Cheryl Lane, Crystal Lane, Carla Mason, Dontrail Mathis, Maranda McCulloch, Keyon Mitchell, Tierney Mitchell, Delores Morgan, Dominique Smith, Mickey Wise, JT Birdine, Darrell Brown, Larry Evans, Marques Frederick, Margaret Jiles, Mary Leeks, Martha Shepherd, Ellich Williams, and Jewel Williams, (collectively "Plaintiffs"), by and through their attorneys, bring this action for damages and other legal and equitable relief from the violation of the laws proscribing discrimination based on race, color, sex, and retaliation, stating the following as Plaintiffs' claims against Pilgrim's Pride Corporation, JBS USA Holdings, Inc., and JBS USA, LLC (collectively "Defendants").

## INTRODUCTION

1.      This is an action brought by Plaintiffs seeking damages from Defendants for acts of discrimination based on race, color, sex, as well as for acts of retaliation, because Plaintiffs engaged in protected activity.  Defendants' acts of discrimination and retaliation are in violation of the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1981 *et seq*.; and the 1991 Civil Rights

Act, as amended, 42 U.S.C. § 1981a *et seq*.; Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e *et seq*.

2.      Defendant Pilgrim's Pride Corporation ("Pilgrim's"), is, in its own words, "the second-largest chicken producer in the world, with operations in the United States, Mexico, and Puerto Rico." Defendant JBS USA Holdings, Inc. and/or Defendant JBS USA, LLC (collectively, "JBS USA") acquired a controlling interest of Pilgrim's in 2009 and currently controls 75.3% of Pilgrim's common stock.   Defendants Pilgrim's and JBS USA are joint employers and operate as a single enterprise.

3.      Both Pilgrim's and JBS USA maintain their corporate headquarters in Greeley, Colorado. Pilgrim's and JBS USA's Mt. Pleasant, Texas plant employs hundreds of employees, the majority of whom are Hispanic. The majority of the supervisors and upper management at the Mt. Pleasant plant are also Hispanic. Black employees at the Mt. Pleasant plant are systematically subjected to racial discrimination, retaliation, and a hostile work environment.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201;  (iii) Title VII of the Civil Rights Act of 1964, as amended and 42 U.S.C. § 2000e *et seq*.; and (iv) 42 U.S.C. § 1981 *et seq*., as amended and 42 U.S.C. § 1981a *et seq*., as amended.

5.      Venue is also proper in this Court pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## PARTIES

6.      Defendant Pilgrim's is a publicly-traded Delaware corporation with its principal place of business located at 1770 Promontory Circle, Freeley, Colorado 80634.   Upon information and belief, it employs approximately 38,000 people and has operations in 12 U.S. states, in addition to operating processing plants in Mexico and Puerto Rico. It has the capacity to process approximately 36 million birds per week resulting in almost 9.5 billion pounds of live chicken annually.

7.      Defendant, JBS USA Promontory Holdings ("JBS USA"), is a wholly-owned subsidiary of Brazilian multi-national JBS S.A., the largest protein processor in the world.   In September 2009, JBS USA announced the purchase of 64% of Pilgrim's shares and controls 75.3% of Pilgrim's stock[1].   JBS USA maintains its corporate office at 1770 Promontory Circle, Freeley, Colorado 80634.

8.      Plaintiff Jimmy Mitchell is a person who has been aggrieved by Defendants' actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

9.      Plaintiff LaShaunda Boyd is a person who has been aggrieved by Defendants' actions.   She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas.

---

[1] *See* www.pilgrims.com/company/pilgrims-story.aspx (last accessed February 17, 2015).

10.     Plaintiff Carla Brooks is a person who has been aggrieved by Defendants' actions. She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas.

11.     Plaintiff Antoinette Brown is a person who has been aggrieved by Defendants' actions.  She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas.

12.     Plaintiff Chris Burns is a person who has been aggrieved by Defendant's actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

13.     Plaintiff Richard Hearn is a person who has been aggrieved by Defendants' actions.  He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

14.     Plaintiff Kristi King is a person who has been aggrieved by Defendants' actions. She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas.

15.     Plaintiff Cheryl Lane is a person who has been aggrieved by Defendants' actions. She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas.

16.     Plaintiff Crystal Lane is a person who has been aggrieved by Defendants' actions. She is and has been, at all relevant times, an African-American female citizen of the Unites States of America and is a resident of the State of Texas.

17.     Plaintiff Carla Mason is a person who has been aggrieved by Defendants' actions. She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas.

18.     Plaintiff Dontrail Mathis is a person who has been aggrieved by Defendants' actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

19.     Plaintiff Miranda McCulloch is a person who has been aggrieved by Defendants' actions. She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas.

20.     Plaintiff Keyon Mitchell is a person who has been aggrieved by Defendants' actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

21.     Plaintiff Tierney Mitchell is a person who has been aggrieved by Defendants' actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

22.     Plaintiff Delores Morgan is a person who has been aggrieved by Defendants' actions. She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas.

23.     Plaintiff Dominique Smith is a person who has been aggrieved by Defendants' actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

24.     Plaintiff Mickey Wise is a person who has been aggrieved by Defendants' actions. She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas.

25.     Plaintiff JT Birdine is a person who has been aggrieved by Defendants' actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

26.     Plaintiff Darrell Brown is a person who has been aggrieved by Defendants' actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

27.     Plaintiff Larry Evans is a person who has been aggrieved by Defendants' actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

28.     Plaintiff Marques Frederick is a person who has been aggrieved by Defendants' actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

29.     Plaintiff Margaret Jiles is a person who has been aggrieved by Defendants' actions. She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas.

30.     Plaintiff Mary Leeks is a person who has been aggrieved by Defendants' actions. She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas.

31.     Plaintiff Martha Shepherd is a person who has been aggrieved by Defendants' actions. She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas.

32.     Plaintiff Ellich Williams is a person who has been aggrieved by Defendants' actions. He is and has been, at all relevant times, an African-American male citizen of the United States of America and is a resident of the State of Texas.

33.     Plaintiff Jewel Williams is a person who has been aggrieved by Defendants' actions. She is and has been, at all relevant times, an African-American female citizen of the United States of America and is a resident of the State of Texas.

## EXHAUSTION OF FEDERAL ADMINISTRATIVE REMEDIES

34.     Plaintiffs who have herein alleged claims pursuant to Title VII have timely filed complaints of discrimination with the Equal Employment Opportunity Commission ("EEOC").

35.     Plaintiffs who have herein alleged claims pursuant to Title VII have either received their Notice of Right to Sue letters from the EEOC or have requested said Notice of Right to Sue letters prior to the filing of this Complaint.

## FACTS UNDERLYING CLAIMS

36.     Pilgrim's was founded in Pittsburgh, Texas in 1946 and had its first major expansion through acquisitions in Mt. Pleasant, Texas in the 1950s and 60s.

37.     In 1986, Pilgrim's became a publicly-traded company and expanded into Mexico the following year.

38.     Pilgrim's sets out as its mission "To be the best in what we set out to do, totally focused on our business, ensuring the best products and services to our customers, solidity to

suppliers, satisfactory profitability for shareholders and the certainty for a better future for *all* employees."[2]

39.     At the helm, Pilgrim's is managed by nine white executives and one Mexican male holding the general director position over their Mexican operations.

40.     Despite Pilgrim's stated diversity and affirmative action efforts, their flagship location in Mt. Pleasant, Texas demonstrates a very different picture for Black and Female employees.

41.     A snapshot of the Mt. Pleasant workforce reveals that Hispanic and White employees reap the benefits of Pilgrim's diversity and equal employment opportunity efforts as they are the higher paid employees and hold the vast majority of management positions.

42.     Conversely, for years, Black and Female employees have suffered discrimination in the terms and conditions of their employment, as well as a plant-wide hostile work environment.

43.     Rather than encourage and foster an inclusive and balanced workplace, a culture has been created wherein an almost exclusively Hispanic hierarchy encourages an environment that reminds Black workers of "their place" in the organization through exclusion, intimidation, segregation, steering, displacement and discouragement.

44.     Where possible, Black employees are steered away from certain departments within the plant and are kept together. At times, some Hispanic employees refuse to work with Black employees and are granted their wish when management quickly transfers the Black employee to work with other Black employees.

---

[2] *See* www.pilgrims.com/company/our-values.aspx (last accessed February 17, 2015; emphasis added).

45.     When Hispanic workers do work with their Black co-workers, they often speak in Spanish when communicating with each other about work related or personal topics.  Upon information and belief, this is done to set Black employees back in the performance of their jobs and to pressure them into requesting transfers.

46.     Much like a plantation environment, a handful of Black employees are also placed in supervisory positions to "deal" with other Black employees that are segregated into certain areas of the plant.  These Black supervisors serve as the buffer between Black line workers and upper management.  Upon information and belief, if said Black supervisors did not "play along" with upper management's rules favoring the Hispanic workforce, they too would be disciplined.

47.     As a result, Black employees are subjected to unequal hiring practices, lower starting pay, assignment to less desirable positions, segregation, delayed and unequal pay raises, disproportionate discipline, lack of advancement, unequal application of company policy and unlawful termination.

48.     From the moment of hire, Black employees are put on unequal footing with their Hispanic and White counterparts, creating a revolving door of Black employees who are, often unbeknownst to them, at a great disadvantage with respect to equal opportunity.

49.     Black employees are routinely disciplined and given "points" for violations that Hispanic and White workers are not disciplined for.  This provides a basis for immediate termination where Black employees do not accept the biased and unlawful working conditions they are subjected to.

50.     As such, many Black employees are denied the opportunity for growth with Defendants.

51.     Numerous written and unwritten policies are either intentionally or disproportionately applied or leveraged against Black employees to maintain a control over management and prevent Black employees from equal opportunity.

52.     For example, virtually all employees are subjected to a ninety (90) day probationary period wherein they become eligible for a number of benefits, including a raise, after completion of probation.

53.     However, Pilgrim's maintains a "quick start" program that enables employees to fast track their probationary period, permitting their access to raises and permanent positions in a more rapid manner.

54.     Hispanic employees are disproportionately assigned into the "quick start" program, while Black employees are made to wait the typical ninety (90) day probation.

55.     Additionally, Hispanic employees are given preferential treatment where other earning opportunities become available.  For example, Hispanic employees are routinely given the opportunity to work overtime before Black employees are.

56.     Black employees are subjected to a racially charged hostile work environment wherein Black employees are subjected to demeaning, humiliating and often threatening racial epithets such as being called "Nigger"  "Niggers" "Nigger Bitch" or "Monkey."

57.     Black employees are also regularly subjected to demeaning, humiliating and often threatening racial graffiti such as drawing of hangings, Nazi pride symbols, and the written or etched use of words such as "Nigger" "Niggers" and "Coons" throughout the public restrooms located in the Mt. Pleasant facility.

58.     Black employees are also publicly demeaned by forcing them to request permission to use the restrooms despite the fact that Hispanic and White employees are free to

use the restrooms as needed and denying requests of Black employees openly and without reason.

59.     Moreover, when Black employees are permitted to use the restroom, they are followed by their White and Hispanic supervisors who would often stand outside the restroom doors waiting for Black men and women to finish using the facilities.

60.     Several Black women are objectified and harassed by their co-workers and supervisors on account of their gender wherein they are forcibly touched and subjected to comments about their bodies and simulated sex acts in the workplace.

61.     Defendants knew or should have known of the hostile and disparate conditions under which Plaintiffs worked. Despite repeated complaints about the discriminatory and hostile work environment, management failed to adequately address these complaints, and in some cases have retaliated against certain Plaintiffs for engaging in protected activity.

62.     Despite the widespread nature of the issues presented in their workplace, Defendants, to this day, have failed to take the necessary and effective remedial steps to eradicate the apparent issues they are presented with relating to discrimination and harassment in the workplace.

63.     Upon information and belief, other than presenting their written policies relating to workplace discrimination and harassment to employees, Defendants have conducted no meaningful diversity or sensitivity trainings to their employees working in the Mt. Pleasant location.

64.     Defendants' discrimination manifested itself through the creation and maintenance of a hostile work environment over several years, the intentional disparate treatment of a protected class of workers, the disparate application of facially neutral policies against a

protected class of workers, the failure to take adequate steps to monitor the workplace, the failure to take effective remedial measures when confronted with acts of discrimination, and the retaliation against employees who oppose the perceived or actual discriminatory practices.  Such discrimination and retaliation constitutes a violation of Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981.

## PLAINTIFFS' ALLEGATIONS

### Jimmy Mitchell

65.     Jimmy Mitchell ("J. Mitchell") began his employment with Defendants in Mt. Pleasant, Texas on February 2, 2012.

66.     J. Mitchell was hired into the West Plant and reported to White supervisor, Randy.

67.     J. Mitchell left Defendants in or about April 2012 and returned to work in July 2012 as part of the "quick start" program in the De-bone department and reported to White supervisor, Lori.

68.     The "quick start" program enabled employees to receive raises faster than the typical ninety-day period.

69.     J. Mitchell is currently employed at Defendants working in the De-bone department and reporting to Black supervisor, Antoinette.  Antoinette was hired in the past two to three months. Prior to this, Jimmy reported to Hispanic supervisor, Rudy.

70.     In August 2012, after being employed for four weeks, Jimmy inquired about receiving a raise under the "quick start" program.  He spoke with Lori.

71.     While Lori had told J. Mitchell she would submit him to the program, when J. Mitchell followed up with her three weeks later, Lori told him that she had forgotten.  After this, Lori became very evasive on the issue.

72.     A few weeks later, J. Mitchell approached Lori a third time and again asked about a raise. She told him not to worry.

73.     In September 2012, after he still had not heard anything, J. Mitchell spoke with a Hispanic woman in Human Resources about the raise he was supposed to receive.

74.     This woman looked in the computer and saw that no such raise had been requested. She then checked with payroll and was informed of the same thing.

75.     Ultimately, J. Mitchell did not receive a raise until after he had been employed for ninety days while Hispanic employees regularly received their raises in the first few weeks of starting.   For example, Pedro was hired in August 2013, and received a raise after only working for Defendants for one week.

76.     In addition to receiving raises earlier than Black employees, J. Mitchell witnessed Hispanic and White employees receive promotions more frequently and more quickly than Black employees.

77.     In or about October 2012, J. Mitchell was told he was being submitted along with a few others for an auditor position, but he was not called for an interview.  Instead, a White employee, Megan, was given an interview, along with some other Hispanic employees.

78.     The auditor position was given to a Hispanic employee in October 2012.  That employee lasted in the position for only a few days.  It was then given to another Hispanic employee who lasted in the position for only a few days.  Finally, it was given to a third Hispanic employee who held the position for a while.

79.     Furthermore, J. Mitchell also requested a transfer to a different department. J. Mitchell spoke with Marco, his Hispanic supervisor at the time.  Marco denied the transfer, claiming he was not letting anyone leave the De-bone section.  However, a White female nicknamed "Red" on the line next to J. Mitchell was transferred to a different department.

80.     On or about September 10, 2013, J. Mitchell applied for another promotion.  He was not contacted for an interview.

81.     Throughout his employment, J. Mitchell's Hispanic co-workers and supervisors regularly speak in Spanish so that J. Mitchell and his Black co-workers are left out of receiving important instructions and information necessary to perform their jobs.

82.     Additionally, Black workers generally must ask permission to use the restroom while Hispanic and White employees are not required to do so.

83.     Throughout his employment, J. Mitchell and his Black co-workers were subjected to a hostile work environment.  J. Mitchell has been called "Nigger" by a Hispanic employee, has heard the term "Nigger" used frequently by his Hispanic co-workers, and has been subjected to racially offensive graffiti in the bathrooms referring to "Nigger" and derogatory images of Black men.

84.     Sometimes the graffiti is painted over, but management has done nothing to address the problem with the employees, or to deter it.

85.     J. Mitchell also encountered hostility from a Hispanic supervisor named Salvador. In September 2012, Salvador made a derogatory hand gesture towards J. Mitchell.  The following day, Salvador intentionally ran over Jimmy's foot with a pallet jack. Once J. Mitchell was able to move, he attempted to go around the pallet jack, but Salvador moved the pallet jack

so that J. Mitchell could not pass.  This was witnessed by another supervisor, Ronnie Snowden. Salvador was not disciplined for his actions.

86.     After Defendants failed to address J. Mitchell's internal complaints, he filed a charge of discrimination with the EEOC on or about November 1, 2013.

87.     Despite his complaints, the practices continued and no steps were taken to address the issues of discrimination and harassment in J. Mitchell's work environment.

88.     While J. Mitchell is still employed with Defendants, he has become completely discouraged and stopped inquiring about promotions.  Since the filing of EEOC charges, Defendants have hired additional Black employees, including some in supervisor positions, but none, including J. Mitchell, have been developed from within.

89.     J. Mitchell continues to be subjected to racial graffiti and racial slurs in the workplace.  There has still been no sensitivity or diversity training or meeting to discuss the severity of discrimination and harassment in the workplace.

### LaShaunda Boyd

90.     LaShaunda Boyd ("Boyd") was employed by Defendants in the Mt. Pleasant, Texas facility from August 17, 2011 until January 8, 2013.

91.     Boyd began working in the plant in the DSI department.  After a few weeks, Boyd was moved to the kitchen.

92.     While she worked in the kitchen, Boyd and her Black co-workers were subjected to racially offensive graffiti such as: "Black people think they run everything," written in Spanish in the bathroom.

93.     During her employment at the plant, Boyd heard people say "Nigger" in both English and Spanish frequently.  When Boyd was working in the kitchen she would report this language to Carol.  To the best of her knowledge, nothing was ever done to remedy this situation.

94.      In October 2012, Boyd was transferred to work inside the plant in the tub wash department.  She reported to Leo Rodriguez, a Hispanic supervisor.

95.     When Boyd was transferred into the tub wash department, she learned that she and her Black co-workers were being paid less than Hispanic employees with similar or lesser seniority or qualifications.

96.     For example, Daniel, a Hispanic employee who was hired after Ms. Boyd, was earning more working in the tub wash department. Boyd was earning $10.55 per hour while Daniel was receiving approximately $11.55 per hour.

97.     Boyd also observed that Hispanic employees were being promoted more quickly than Black employees.  For example, Luis, a Hispanic employee who began working for Pilgrim's after Boyd, was promoted to a lead man within one month of being hired.

98.     In or around the summer of 2012, Boyd applied for a lead position.  However, the position was given to another Hispanic employee who had been hired after Boyd.  Hispanic employees were given preferential treatment and as a result, the majority of lead man and supervisors were Hispanic.

99.     Boyd was also held to different standards and disciplined more harshly as compared to her Hispanic co-workers.  For example, when working in the plant, Boyd and her Black co-workers were required to ask permission to use the restrooms.  Hispanic and White employees typically left the work lines to use the restrooms without asking permission and were not written up for doing so.

100.     Also, while in the plant, a group of Hispanic workers regularly did not clock out during lunch, which is stealing time from Defendants.   Once it was discovered by Leo, he gave them a verbal warning.   In December 2012, when Boyd simply clocked in and out from two different gates, Leo accused her of not clocking out and sent her to Human Resources to be disciplined. Boyd believes that had she not clocked out she would have been fired on the spot without receiving the warning that the Hispanic workers received.

101.     Boyd later learned that after Leo sent her to Human Resources, he said "LaShaunda won't be back" to Boyd's lead man, Luis, and immediately placed a Hispanic employee in her position to start training.

102.     When Boyd returned to her position, Leo was surprised, but decided to keep the Hispanic employee working with Boyd to train her as if he knew she would be gone.

103.     On January 3, 2013, Boyd got into a disagreement with her Black co-worker.   Leo sent them both to be drug tested, which was one method Hispanic managers used to terminate Black employees.   However, both employees passed the test.

104.     However, on January 8, 2013, Boyd received a phone call telling her that she was being terminated.   One week prior, a Hispanic woman got into a fight at work and received only a warning.

105.     Throughout her employment, Boyd regularly complained to her supervisors about how she was treated by her Hispanic co-workers, but her complaints were repeatedly ignored.

**Carla Brooks**

106.     Carla Brooks ("Brooks") was employed by Defendants in Mt. Pleasant, Texas from July 2012 to August 2012.

107.    Brooks was initially hired to work as a wing shredder.  She reported to a Hispanic supervisor, Marco.

108.    From the onset, Brooks recognized the difference in treatment she was receiving under Marco.  For example, the company hired two other female employees into Brooks' department because there was so much work. When Brooks inquired about who would be helping her, Marco responded, "no one, you're doing all three jobs," referring to the jobs of the two new hires.

109.    Also, while working the line she had to raise her hand to request permission to use the restroom.  Hispanic workers never had to request permission.  Instead, Marco would routinely deny her requests forcing her to stay on the line or be disciplined.

110.    Brooks also experienced frostbite on her fingers. When she asked Marco for permission to warm her fingers, he refused.

111.    On another occasion, Brooks was disciplined for stepping off the line because she was ill.  This did not happen to Hispanic workers.

112.    Within a month, Brooks new she was being mistreated and asked Chris, the White superintendent, for a transfer to work under a different supervisor.  Chris denied her request.

113.    As she could not continue to work under Marco, Brooks asked Mario, another Hispanic supervisor, for a transfer.  However, Marco disparaged Brooks to Mario by telling him that Brooks had cursed him out.  This was untrue.

114.    As a result, Mario then switched Brooks' shift to a shift he knew she could not work.

115.    Brooks called Defendants' corporate office to complain about the discriminatory treatment. However, Brooks did not hear back from corporate and after a few days she called again to follow up.

116.    Brooks was told that they spoke to Mario and it was suggested that Brooks not return to work for Defendants.  As a result, Brooks was terminated.

117.    In or around May or June 2013, and in November 2013, as she needed to find work, Brooks reapplied for a position with Defendants and was denied each time. White and Hispanic employees have been rehired by Defendants after they have been terminated.

118.    Brooks' transfer to a shift that she could not work and the failure to rehire her was in retaliation for her complaints about discrimination.

**Antoinette Brown**

119.    Antoinette Brown ("Brown") was employed by Defendants in Mt. Pleasant, Texas from June 25, 2012 until December 11, 2012.

120.    Brown was initially hired in to the De-bone department.  She reported to Daniel and Jose, both Hispanic.

121.    Brown from $8.10 to $10.55 in August 2012.  However, Brown did not receive her raise until the end of September 2012.

122.    Additionally, Defendants maintained a policy where, after sixty (60) days, employees were entitled to two (2) paid days off.

123.    In or about October or November of 2012, Brown needed to take a day off to assist her mother who was scheduled for surgery.  She requested the day off from Jose, who referred her request to another Hispanic lead, Daniel, who approved her request.

124.    However, upon returning to work, Brown learned she had been disciplined for the day.

125.    Brown and other Black co-workers were held to a different standard than similarly situated Hispanic and White employees.  For example, Brown and her Black co-workers would be scrutinized more frequently than Hispanic and White workers with respect to their appearance and dress.

126.    Brown and her Black co-workers were also more frequently moved from line to line without any say in the matter, while Hispanic and White employees were typically given preference over where they wanted to work.

127.    Also, Brown and other Black co-workers had to raise their hands to request permission to use the restroom.  However, Hispanic and White employees did not have to raise their hands. Even when Brown asked her lead man, Daniel, for permission to use the restroom, he often made her wait.  Whereas Rosie, a Hispanic employee on Brown's line, did not have to ask permission and left the line whenever she needed to use the restroom, or to chat with other Hispanic workers on other lines.  Rosie was never disciplined for such conduct.

128.    Brown was also subjected to a hostile work environment. For example, in the summer of 2012, a Hispanic co-worker referred to another Black employees as a "Nigger."

129.    Throughout her employment, Brown was also subjected to repeated graffiti containing racial slurs and comments in the bathrooms. While much of it was written in Spanish, Brown and other Black employees knew what was written.   There were also derogatory comments written about President Obama during his re-election.

130.    Brown was also subjected to sexual harassment from Soliman, a Hispanic co-worker.

131.    Soliman would frequently make inappropriate sexual hand gestures at Brown and call her names in Spanish, which Ms. Brown understood to mean "Ho" or "Bitch."  Such conduct occurred on a daily basis.  Brown reported it to her lead man, but the harassment continued.

132.    On December 11, 2012, Brown was constructively discharged as she was forced to deal with continued daily harassment and discrimination.

### Chris Burns

133.    Chris Burns ("Burns") was employed by Defendants in Mt. Pleasant, Texas from in or about December 2011 until April 2012.

134.    Burns was initially hired into a position pulling tenders, but was almost immediately moved to wing cutting.   He reported to a Hispanic supervisor, Delora.

135.    Burns and his Black co-workers would request overtime; however, these opportunities were reserved for Hispanic employees.  For example, on most Fridays Hispanic employees would be kept on for overtime while Black employees did not have the same opportunity to earn the additional compensation.

136.    Burns had to take medication that required him to use the bathroom more frequently than normal.  However, Black employees were required to seek permission to use the restrooms whereas Hispanic and White employees were not.   Burns's requests to use the restroom were constantly denied by his Hispanic supervisors Delora and Marco.

137.    Burns was regularly followed to the bathroom by his Hispanic supervisors, Delora and Marco.  They would check to make sure that you were not taking "too long" in the bathroom.

138.    Burns was also subjected to a racially hostile work environment wherein he was exposed to racially offensive graffiti in the bathrooms including comments such as, "Niggers

need to get away from here." Nothing was ever done to remove the graffiti or address discrimination in the workplace. The graffiti continued throughout his employment.

139. As it was typical for Black employees to constantly be displaced and assigned less desirable positions, toward the end of his employment, Burns was once again moved to a line that was very backed up. When he got there, he was not given the proper assistance needed to complete the job. Burns asked his Hispanic supervisor for more help, but was ignored. Burns felt that he was set up to fail.

140. Burns was constructively discharged in April 2012, when he was forced to leave as a result of continued disparate treatment and harassment due to his race.

### Richard Hearn

141. Richard Hearn ("Hearn") was employed by Defendants in Mt. Pleasant, Texas from August 26, 2011 to September 26, 2012.

142. Hearn started his employment in the Prepared Foods department reporting to a Hispanic supervisor, Jose.

143. Hearn and other Black employees were regularly reassigned to jobs on a whim or as needed. On one occasion Jose moved Hearn to another work area to work with three Hispanic employees. The three Hispanic workers refused to work with Hearn.

144. As a result, Hearn had to complete all of the work on his own and the Hispanic employees were not disciplined. When Hearn complained to Jose, Jose responded, "Don't worry about it cause you're a big old black guy."

145. Hearn complained to the Superintendent about how Jose treated him and how Jose constantly moved him from line to line, but did not do the same to his Hispanic and White co-workers. Nothing was done to resolve the problem.

146.    Hearn and other Black employees were humiliated by having to ask permission to use the restrooms whereas Hispanic and White employees were able to use the restrooms without permission or fear of discipline.

147.    Defendants also cut Hearn's pay without excuse or reason.  Hearn regularly worked a forty (40) hour workweek, but he would only be paid for working 22 to 26 hours per week.  Hearn also complained about this to Christian, but often times the problem went uncorrected.

148.    Also, Hearn worked second shift and was being paid shift differential for working that shift.  Soon after, Hearn stopped receiving the additional pay but Hispanics continued to receive it.

149.    Hearn complained to Jose and Mario Contrares from Human Resources about the lost pay.  They told Hearn they would straighten it out, but Hearn never received it.

150.    About six (6) months into his employment with Defendants, Hearn was called into Contrares' office in Human Resources late in the evening.  Contrares wanted a copy of Hearn's social security card.  Hearn informed him that the company already had a copy of his card on file from when they hired him, but Contrares threatened to terminate Hearn if he did not turn over his social security card.  Hearn complied.

151.    Throughout his employment, Hearn was also subjected to a hostile work environment.  For example, Hearn was subjected to racial slurs and derogatory comments by his White and Hispanic co-workers and supervisors.  Specifically, Hearn was subjected to racial slurs on multiple occasions by a White employee in the wing department, who made comments such as, "You Niggers think you can run this place."

152.    Hearn reported this to Jose, who laughed it off. Hearn did not find it to be funny.

153.    Hearn and his Black co-workers were also subjected to racially offensive graffiti in the restrooms including "Fuck you Nigger" and "Nigger do your job clean this shit up." Hearn complained about the graffiti to his supervisor and Superintendent. Nothing was ever done to address the racially hostile graffiti as it continued until Hearn's last day.

154.    In and around September 2012, Hearn was working at the end of the combo line and was waiting for the forklift to pick up the product.  A Hispanic employee typically ran the forklift but was not picking up the products.  Another employee started to use the forklift and got into an accident.  As a result, everyone in that area, including Hearn, was drug tested.

155.    Hearn passed the drug test and had to give a statement regarding the incident. Hearn was given a three-day suspension because while he had not operated the forklift or caused the accident, he had touched it.

156.    After his three-day suspension, Hearn was terminated and told that he could reapply within thirty (30) days.  In contrast, when Hispanic employees failed drug tests, they were not terminated, they instead were transferred to a different shift.

157.    When Hearn attempted to reapply after the thirty (30) day period, he was now told that he had to wait ninety (90) days before he could reapply.

158.    When Hearn attempted to reapply after the ninety (90) day period, he was told that he needed to wait an entire year after his termination in order to reapply and he would need at least six (6) months of employment with another company before he could be rehired.

**Kristi King**

159.    Kristi King ("King") was employed by Defendants in Mt. Pleasant, Texas from April 12, 2012 until July 23, 2012.

160.    King began her employment as a wing cutter. However, immediately after she was hired into this position she was forcibly moved to trim line by her Hispanic supervisor, Mario. King remained in this position for the remainder of her employment.

161.    Hispanic employees started at higher rate of pay and received raises sooner than Black employees.  For example, King was hired at $8.50 per hour while Hispanic employees hired at the same time were paid $9.00 per hour. Moreover, these Hispanic employees were given a raise before the conclusion of their ninety (90) day probationary period.  Black employees do not receive a raise, if at all, until after the probationary period.

162.    When King filled out an application to be a line lead, she was expressly told by Mr. Cooper, one of the few Black supervisors, "it's going to be hard for you to get that position, they don't like our color around here." As expected, a less qualified Hispanic employee was given the position over King.

163.    Furthermore, King was not paid for overtime hours she worked whereas Hispanic employees were paid properly.

164.    King was also told by numerous Hispanic supervisors that she could only work with other Black employees. To carry out their wishes, these supervisors would constantly relocate King and other Black employees to other lines in order to keep them all together and away from the Hispanic and White employees.

165.    King and her other Black co-workers had to ask permission to use the restrooms whereas the Hispanic employees could leave the work lines without permission whenever they wanted. The Hispanic supervisors would tell King that if she used the bathroom without permission they would give her a half a point as discipline. Generally, Hispanic employees could do whatever they wanted without fear of discipline.

166.    King was subjected to racial slurs and derogatory comments by White and Hispanic co-workers. For instance, one White employee called King a "Nigger" and other White and Hispanic employees made frequent racial comments towards Black employees.

167.    Throughout her employment, King was continuously exposed to racially offensive graffiti on the bathroom walls. The word "Nigger" was written in Spanish along with drawings of nooses.

168.    King reported the graffiti, but nothing was done and it continued.

169.    On July 10, 2012, King was hit in the leg by an electric pallet jack driven by a White male. When she went to the nurse's office, she was directed to take eight pills of Tylenol to treat the pain.

170.    Due to the pain and severity of her injury, King asked the nurse whether she should visit the hospital. In response, the nurse stated, "You better not go, you'll get fired."

171.    A few days later, King was still in pretty severe pain and went to the hospital where she discovered she had a significant contusion. Given the injury, she was directed to not report to work.  When King was able to go back two weeks later, she was terminated on the spot by Mario.  He specifically told her that she was fired for going to the hospital.

**Cheryl Lane**

172.    Cheryl Lane ("Cheryl Lane") was employed by Defendants in Mt. Pleasant, Texas from May 5, 2012 to November 23, 2012.

173.    Cheryl Lane worked in DSI and reported to Jose, a Hispanic supervisor.

174.    Cheryl Lane's initial pay rate was $8.55 per hour.

175.     Cheryl Lane was informed that after ninety (90) days she would receive a raise. However, in or around June 2012, a few Hispanic employees were hired to work on Cheryl Lane's line with a starting pay of $10 per hour.

176.     Cheryl Lane and her Black co-workers were constantly being moved or transferred to different work lines.  Cheryl Lane observed that Hispanic workers were not moved in the same manner and frequency that Black employees were moved.

177.     Cheryl Lane complained about this practice to Manuel, her Hispanic lead man. Manuel told Cheryl Lane that that was just how it was and there was nothing he could do.  In contrast, if a White or Hispanic employee specifically requested to move, those requests were granted.

178.     Throughout her employment, Cheryl Lane's Hispanic co-workers and supervisors regularly spoke in Spanish so that Cheryl Lane and her Black co-workers could not understand what was being said.  Upon information and belief, this led to Cheryl Lane missing instructions and important information.

179.     Cheryl Lane and her Black co-workers were subjected to a hostile work environment. For example, Cheryl Lane was called "Nigger" by her White female co-worker.

180.     Cheryl Lane reported that she was called "the N-word" to Manuel, but he pretended to not know what she was talking about.  Cheryl Lane then reported this incident to another lead who reported it to a White supervisor, Leo.

181.     In front of her co-workers, Leo then pulled Cheryl Lane from her line, asked her to point out the woman who had called her "Nigger" and sent Cheryl Lane back to her line.

182.     The White woman was not terminated and Cheryl had to continue to work with her.

183.     Cheryl Lane was also subjected to racially offensive graffiti in the restrooms.  For example, Cheryl Lane saw "Nigger" written on a bathroom stall.  She had asked to go to the bathroom after the White woman called her "Nigger" so that she could calm down only to see that same exact word written in big letters on the bathroom stall. She returned to the line crying and was asked by a co-worker why she was crying.  She told them the truth about the writing on the wall in the bathroom.

184.     Cheryl Lane also experienced sexual harassment from her co-worker, Dave.  Dave would rub up against her and whisper sexually degrading comments in her ear, such as "I bet you can bend over and I can just ram it all up in you."

185.     Dave also assaulted Cheryl Lane by palming her underside from behind her.

186.     Cheryl Lane reported these incidents to several leads and Jose, a Hispanic supervisor.  Rather than terminating Dave, Cheryl Lane was just moved to a different line.

187.     In November 2012, Cheryl Lane's blood pressure spiked at work and was sent home by the nurse.  She was told she could return to work with a doctor's note.

188.     Cheryl Lane obtained the required doctor's note and attempted to contact Human Resources.  After calling several times and leaving messages, Cheryl Lane was able to reach Faith from Human Resources.

189.     Faith refused to let Cheryl Lane return to work and told her that she would have to wait six (6) months before she could be rehired.  As a result, Cheryl Lane was terminated.

190.     Hispanic employees were not treated in the same manner.

### Crystal Lane

191.     Crystal Lane ("Crystal Lane") began working for Defendants as an auditor on May 5, 2012.  She reported to a Hispanic supervisor, Leo Dominguez.

192.    In or about June 2013, Crystal Lane was transferred to work inside the plant in the DSI section where she worked pulling nuggets.   She reports to a Filipino supervisor named Malene.

193.    In or about September 2013 Crystal Lane transferred to East Plant to work in wings.   She reported to White supervisor, Kristie Harris.   She worked there until November 7, 2014.

194.    Most Hispanic employees received raises prior to the completion of their probationary period.   When Crystal Lane asked her Hispanic supervisor, Marco, if she could receive a raise prior to completing probation, he refused.

195.    When Crystal Lane responded by identifying "other" Hispanic employees who had received their raises after only working at Defendants for a week or two, Marco responded, "You aren't other people."

196.    In or about June 2013, Crystal Lane and the other auditors were informed by Dominguez that they were cutting down auditors. She was moved to DSI.   However, that same month, a Hispanic employee had just been hired to work as an auditor.   It was typical to displace Black employees in favor of Hispanic employees.

197.    Around the same time, Crystal Lane spoke to Hispanic superintendent Shelly about taking a vacation day on June 14, 2013.   Shelly denied the request.

198.    Crystal Lane then spoke with the De-bone superintendent about taking the day and he suggested that she just take the day as an unexcused absence because she only had three points at the time and would not be terminated.

199.    Crystal Lane took the day, but when she returned, she learned that she now had ten points.   Generally, seven points warrants a termination.   Crystal Lane was called to Human

Resources to discuss the points.  No one could explain why she was given so many points.  After that meeting, some points were removed, but not all of them.  She was left with eight points, but was not terminated.

200.    In June 2013, Crystal Lane applied for a lead position.  The position was given to a Hispanic employee, Brenda, who had just returned from a maternity leave.  Brenda was an auditor before she went on leave.  Crystal Lane was not even interviewed for the position.

201.    In July of 2013, Crystal Lane asked Shelly for permission to go to the nurse to get ibuprofen for a migraine she was experiencing.  Shelly denied the request and responded, "That's not my problem."  Hispanic employees are allowed to go to the nurse whenever they wish.

202.    Throughout her employment, Crystal Lane's Hispanic co-workers and supervisors regularly speak in Spanish so that she and her Black co-workers cannot understand what is being said.  This has led to Crystal Lane and other Black employees missing instructions and important information.

203.    Crystal Lane and her Black co-workers must raise their hands to request permission to use the restroom.  Often times, she is denied permission.  However, her Hispanic co-workers do not have to ask for permission and are free to use the restroom whenever they wish.

204.    Crystal Lane and her Black co-workers are also regularly subjected to racial slurs on a daily basis and racial graffiti in the bathrooms including "Nigger," "Niggers suck," and "Coons."  Crystal Lane reported the racial graffiti to Vanessa in Human Resources, but nothing has been done to stop it or punish those accountable.

205.    Crystal Lane has also been subjected to sexual harassment.  She is regularly harassed by male Hispanic employees who grab her chest, make comments such as "big boobs, I like big boobs," and proposition her to have sex for money.

206.    Her harassers have also tried to hug and kiss her.  Crystal Lane resists and tells them to stop.

207.    The harassment started as a daily occurrence, but then occurred several times a week until her employment ended.

208.    Crystal Lane has regularly reported these incidents to Mr. Dominguez, he has simply responded, "You'll be okay; you're just a pretty little girl."

209.    In June 2013, Crystal Lane reported the sexual harassment to Human Resources and wrote a statement.  Nothing was done to address this conduct.  Instead, Crystal Lane attempts to hide or avoid her harassers as much as possible, but the harassment continues.

210.    On or about November 1, 2013, Crystal Lane filed a charge of discrimination with the EEOC.

211.    Despite her complaints, the practices continued and no steps were taken to address the issues of discrimination and harassment in Crystal Lane's work environment.

212.    Once Crystal Lane found new work, she left the job on November 7, 2014.

213.    In January 2015, Defendants contacted Crystal Lane to offer her a lead position. The position would have paid more than she was earning at the time; however, given the fact that the environment at Defendants had not changed, Crystal Lane did not feel safe returning to work with Defendants.

**<u>Carla Mason</u>**

214.    Carla Mason ("Mason") was employed by Defendants in Mt. Pleasant, Texas from June 25, 2012 to December 3, 2012.

215.    Mason began her employment in the Wings department and reported to Hispanic supervisor, Marco.

216.    In or about July 2012, Mason was moved to the De-bone Production line to work under Black leads as Hispanic employees would get the better positions in the Wings department.

217.    While Hispanic employees typically received their first raise before the completion of their ninety (90) day probation period, Mason and her Black co-workers would not.

218.    Mason complained to both her supervisors about why she had to wait ninety (90) days and Hispanic employees did not, but she received no response.

219.    From the outset of her employment, Hispanic employees would be given materials necessary for performing their jobs whereas Mason and her Black co-worker had to seek out the information and ask permission to get the materials.

220.    Hispanic employees were also given preferential treatment when they would be placed on lines ahead of Black employees despite seniority or qualifications.  Black employees would be placed after Hispanics on most occasions.

221.    At one point Mason asked to be moved to a different line but was not allowed. However, a Hispanic female was able to move to a different line.

222.    Mason complained to Marco in Human Resources and was told that he would look into it, but nothing was changed.

223.    In or around October 2012, there was an ammonia leak in the plant which caused Mason to have a severe headache. However, she and all her Black co-workers were told they had to stay and if they left they would have received a point on their attendance record.  A number of Hispanic employees were sent home without any repercussions.

224.    Throughout her employment, Mason and her Black co-workers had to raise their hands to ask permission to use the restroom. However, Hispanic workers did not have to ask for permission.

225.    During her entire period of employment, Mason and her Black co-workers were also subjected to racial slurs and a hostile work environment.  Specifically, Mason was called "Nigger" and "Bitch" numerous times by Hispanic co-workers.

226.     Mason would regularly see racial graffiti in the bathrooms including "Nigger," and "Black Bitch." Mason reported the comments and racial graffiti to supervisors, but nothing was done.

227.    From July 2012 forward, Mason was sexually harassed several times by a co-worker named David Smith. He would make comments such as "I want to rub up on you the way your butt looked" and "I'd like to see you at night so I can stick you." This same co-worker also placed a broomstick up between her legs twice.

228.    Mason complained several times to Mario in Human Resources.  Only after she complained several times about the continued harassment, was some action taken.  The co-worker was just moved to a different department.

229.    Unfortunately, this did not stop him from continuing to sexually harass Mason on the job. Upon information and belief, had this happened to a Hispanic employee, management would have taken the situation much more seriously.

230.    On December 3, 2012, when the employees were returning from their break, Mason slipped on a co-worker's smock. Her supervisor said because it was an accident he needed to follow procedure and give her a urine test.  However, Mason had just gone to the bathroom on her break so she could not take the urine test.

231.    Management had Mason sit and drink water to wait for the test, however, she could not go.  Instead, Mason was terminated by Human Resources because she could not take the urine test.

### Dontrail Mathis

232.    Dontrail Mathis ("Mathis") was employed by Defendants in Mt. Pleasant, Texas from July 27, 2012 until October 19, 2012.

233.    Mathis was hired into the Prepared Foods section of the plant and reported to a Hispanic supervisor named Marco.

234.    During his time of employment, Mathis witnessed Hispanic workers earn promotions within ninety (90) days of being hired, while Black workers generally waited well beyond ninety (90) days to earn promotions or any raises.

235.    Throughout his employment, Mathis' Hispanic co-workers and supervisors regularly spoke in Spanish so that Mathis and his Black co-workers could not understand what was being said.  This led to Mathis missing instructions and important information necessary for his job.  Upon information and belief, this was done in a racially discriminatory manner and to set Mathis up to fail.

236.    Hispanic workers were permitted to take bathroom breaks freely and at their own discretion, but Mathis and his Black co-workers were forced to first raise their hands and wait for a supervisor to approve their requests to use the bathroom facilities.

237.    Mathis witnessed two Hispanic supervisors, Osmon and Marco, deny Black workers bathroom breaks, and tell them to wait until their lunch breaks to use the bathroom facilities. This was humiliating and degrading towards the Black workforce.

238.    During his entire time working at Defendants, Mathis and his Black co-workers were subjected to a hostile work environment including frequent racial slurs, such as "Nigger," other comments, and racially discriminatory graffiti such as "F Niggers" written in the bathroom facilities.

239.    Supervisors were aware of the openly hostile work environment, but did nothing to address it. Mathis even complained by calling the corporate office in Colorado, but nothing was done.  However, the day after he made the call, Mathis' supervisor, a White woman named Lorie, changed Mathis' job and required him to clean out a gutter containing chicken guts.

240.    In early October 2012, Mathis complained to Joanne in Human Resources about a White employee who frequently used the term "Nigger," but she did nothing to address the problem, and did not aid Mathis in submitting a formal written complaint.

241.    In mid-October, 2012, while Mathis and several Black co-workers were using a men's bathroom facility, Lorie entered the bathroom and began to harass and accuse the workers of using their cell phones, even though the workers were not on their cell phones.

242.    Lorie entered the bathroom without regard for the fact that the bathroom was occupied. When Mathis complained to Joanne in Human Resources about the incident, Joanne laughed and dismissed his complaint. She also told him that it was not possible to make a written complaint, and threatened to force him to work in the West plant, which had a largely African American workforce.

243.     During an ammonia leak at the plant, Mathis fell trying to escape the fumes and was injured.  After going to the emergency room, Mathis missed approximately a week of work. When he returned to work, Mathis was told that he had been given points for missing work.

244.     Mathis was told he was terminated because he had exceeded the number of points allowable according to Defendants' progressive disciplinary system. However, although Mathis inquired about the list of incidents leading to his final point accumulation, he was never provided with such information, and was simply told by Marco in Human Resources that he had accumulated too many points.

245.     Mathis was terminated in retaliation for confronting and opposing the widespread discriminatory practices at the plant.

### Maranda McCulloch

246.     Maranda McCulloch ("McCulloch") was employed by Defendants in Mt. Pleasant, Texas from January 11, 2013 to in or around August 2014.

247.     McCulloch began her employment in the DSI section of the West Plant and she reported to Mabeline, a Hispanic supervisor.

248.     In or around February 2013, she was moved to the De-Bone section where she reported to a female Hispanic supervisor.

249.     McCulloch and her Black co-workers had to work for ninety (90) days before they could be eligible for a raise.  However, Hispanic and White employees were eligible for raises and received raises prior to completing the probationary period. For example, a female Hispanic and White employee, Alex Evans, who was hired the same day as McCulloch received a raise prior to having ninety (90) days on the job.

250.    Throughout her employment, McCulloch's Hispanic co-workers and supervisors regularly spoke in Spanish so that McCulloch and her Black co-workers could not understand what they were saying.  This was done to prevent the Black employees from obtaining important instructions and information needed to do their jobs.   For example, when McCulloch was working in the de-bone section of the plant, Hispanic workers would address problems on the line in Spanish.   When McCulloch was unable to improve her performance based upon the instructions given in Spanish, the Hispanic co-workers and supervisors would laugh.

251.    Whenever McCulloch needed to use the bathroom, she and her Black co-workers had to get permission.  However, White and Hispanic employees are not subjected to the same barriers when they need to use the restrooms.

252.    McCulloch has been repeatedly denied permission to use the restroom by her lead Hispanic lead man, Francisco, and another supervisor named Delores, who is White. Additionally, when she was allowed to use the restroom, McCulloch was followed by a supervisor or lead person and was put on a timer as to how long she was in the restroom.

253.    In or about February 2013, McCulloch was experiencing a lot of pain and nausea. She went to the doctor and learned that she was pregnant. Due to the requirements of her position on the line, McCulloch had to stand for at least eight hours a day.

254.    McCulloch asked Delores if she could be moved to a position that did not require her to be on her feet for eight hours per day. Delores denied this request.

255.    There were several positions that did not require standing all day such as passing out or sorting equipment, cleaning, or monitoring the hallways.

256.    A week after McCulloch spoke with Delores, she spoke with Mario in Human Resources.  She inquired about moving to a more suitable position given her pregnancy or, in the

alternative, any medical leave she would be eligible for.   Both requests were denied without any discussion or consideration.

257.   However, McCulloch observed Hispanic employees that were given special accommodations and placed in light duty positions upon request.  McCulloch believes she was denied an accommodation because of her race.

258.   In March or April 2013, McCulloch complained to her supervisor, Delores, about having to raise her hand to use the restroom and being denied permission, especially since she was pregnant.

259.   McCulloch also complained to Mario in Human Resources and reported that she believed her lead man, Francisco, was discriminating against Black workers.

260.   Despite her complaints and Mario's assurance that something would be done, nothing changed.   After she complained to Human Resources, McCulloch still had to ask permission to use the restroom.

261.   In and about April 2013, McCulloch miscarried.  She attributes this to the hostile work environment, discrimination and lack of accommodations by Defendants' during her pregnancy.

262.   As a result of her miscarriage, McCulloch had to miss one week of work.  Despite having a doctor's note, she was given points for missing those days.

263.   In or about August 2013, one of McCulloch's Hispanic co-workers called her a "Black girl" and associated that with her being "lazy." She reported this to her Hispanic line lead, Francisco, and Hispanic supervisor, Hellreque ("Reque"), but nothing was done.

264.   After having her internal complaints go unaddressed, McCulloch filed a charge of discrimination with the EEOC on or about November 1, 2013.

265.    Despite her complaints, the practices continued and no steps were taken to address the issues of discrimination and harassment in McCulloch's work environment.

266.    On February 18, 2014, McCulloch became very ill at work. While in pain, McCulloch looked for Reque to request to go home.  She could not find him.

267.    Instead, McCulloch told her line leader, Francisco. He gave her permission to leave.

268.    When McCulloch returned to work the next morning, she found out from Joanie in Human Resources that she had been terminated for not telling her supervisor that she had left.

269.    However, when she pressed the issue to Joanie's boss, Joanie told McCulloch that she would only be suspended for three days without pay instead.

270.    On or about February 27, 2014, McCulloch returned to work after serving the three day suspension.

271.    During the summer of 2014, McCulloch witnessed the word "Nigger" carved into a stall door in the women's restroom inside the plant.  The carving stayed up for a week until it was painted over, but the word was still visible.

272.    In or about May 2014, McCulloch became ill while at home.  Due to her increased pain, McCulloch immediately sought medical treatment.

273.    McCulloch was required by her treating physician to take the next four (4) days off from work.

274.    When she returned to work, McCulloch provided Joanie with a doctor's note as required.  This time, Joanie told McCulloch that she did not care that she had a doctor's note and McCulloch was terminated again.

275. Immediately following her termination, McCulloch contacted Joanie's boss who informed her that what Joanie did was wrong and that McCulloch would be reinstated.

276. In August 2014, McCulloch questioned Larry Jenkins, her Hispanic supervisor, about why her check had pay discrepancies for the past few weeks.

277. McCulloch noticed she was not being paid for the hours that she was actually working. More specifically, Jenkins was not clocking McCulloch in until hours after she was at work, shorting her pay.

278. McCulloch told Jenkins that she was not going to return to work until she was properly compensated for her hours worked. In response, Jenkins told McCulloch she was fired.

279. McCulloch believes the real reason she was fired was because of her race and/or for her complaints of discrimination and for filing a charge of discrimination with the EEOC.

**Keyon Mitchell**

280. Keyon Mitchell ("K. Mitchell") was employed by Defendants in Mt. Pleasant, Texas from June 2012 to August 1, 2012.

281. K. Mitchell began as a wing cutter and after about one week was moved to cutting tenders out of chickens. He reported to a Hispanic supervisor named Marco.

282. When K. Mitchell began his employment with Defendants, he was hired earning $8.25 per hour. However, he was told that because of his previous experience working at a plant for 35 years, he would receive a raise to $10 an hour after working for two weeks.

283. Instead, a Hispanic, less experienced co-worker who started at the same times as K. Mitchell, received a raise after just two weeks. Upon information and belief, the Hispanic worker was paid $11 per hour.

284.    Even after being asked to train new employees, K. Mitchell did not receive a raise, probationary or otherwise.

285.    Additionally, as a general practice, the predominantly Hispanic supervisors would place fellow Hispanic workers in positions that had a higher pay rate or opportunity for growth.

286.    For example, K. Mitchell initially applied for a lead position, but was told that he needed to wait until his probation period ended to apply for that position while Hispanic would have the earlier opportunity to obtain jobs with better opportunity.

287.    To add further insult and humiliation, K. Mitchell and his Black co-workers had to ask permission to use the restrooms.  Hispanic employees could leave the work lines to use the restrooms without asking permission and were not written up for doing so.

288.    There was also a Hispanic employee designated to assign breaks to employees, but he would overlook Black employees.

289.    In general, the Hispanic workers were afforded much greater independence and freedom, while the Black workers were constantly working under a microscope.

290.    While working for Defendants, K. Mitchell and his Black co-workers were subjected to a racially hostile work environment.  During the second week of his employment, while cutting tenders out of the chicken, his Hispanic co-worker repeatedly said the word "Nigger."

291.    That same co-worker also complained, in Spanish, to the Hispanic female line lead that he "didn't want to work with no Nigger."

292.    Within one week of this employee's complaint, K. Mitchell was moved to a different position putting chicken on a cone and replaced by a Hispanic worker.   Upon information and belief, the co-worker who called K. Mitchell a "Nigger" was not disciplined.

293.   In K. Mitchell's original position, he could earn up to $4.00 more per hour than employees who put the chicken on a cone.  This was how management made sure better paying positions would be available for Hispanic employees.

294.   K. Mitchell complained to Marco, the Hispanic supervisor, about this demotion, but nothing was changed.

295.   K. Mitchell also overheard Hispanic employees refer to Black employees as "Niggers" in the bathroom.

296.   In addition to the racial slurs made throughout the workplace, there was also racially offensive graffiti on the bathroom walls.  Statements such as "Niggers" and "you niggers need to go back home" were regularly written on the walls.

297.   K. Mitchell reported this graffiti to Marco, but it continued.

298.   For as long as K. Mitchell was employed with Defendants, they never tried to remove the graffiti and, upon information and belief, never reprimanded any guilty party for doing it.

299.   There were also never any meetings held to address discrimination in the workplace.

300.   In or about late June 2012, K. Mitchell complained to Marco and Human Resources about the graffiti and about his co-workers using the word "Nigger." He also complained about issues with his paycheck.

301.   The problems with the paychecks were addressed, but he never heard from them in response to his complaints about the hostile work environment.

302.    As a result of the constant disparate treatment, hostile work environment and retaliation that K. Mitchell experienced after complaining about being called a "Nigger," he was constructively discharged on August 1, 2012.


### Tierney Mitchell

303.    Tierney Mitchell ("T. Mitchell") was employed by Defendants in Mt. Pleasant, Texas from September 2012 to November 2012.

304.    T. Mitchell was assigned to the Prepared Foods department and reported to a Black male and Hispanic female lead.

305.    T. Mitchell observed that Hispanic employees were given raises before Black employees were given raises.  Specifically, he was hired at the same time as a Hispanic employee who received a raise before he received did.

306.    T. Mitchell and his Black co-workers had to raise their hands to ask permission to use the restroom, but Hispanic and White employees did not have to do the same.

307.    Black workers were also not allowed to speak while working, but Hispanic workers were allowed to converse with each other.

308.    T. Mitchell worked on a production line with a Rick, a White employee who called him "Nigger" on a daily basis.

309.    T. Mitchell complained to two different Hispanic line leaders and Human Resources, but nothing was ever done to address the White employee's conduct.  The employee continued to call him "Nigger" even after he complained.

310.    T. Mitchell and his Black co-workers were also subjected to racial graffiti in the bathrooms including "Nigger" and derogatory drawings of Black people.

311.    In or about November 2012, T. Mitchell was transferred to a driving position.

312.    However, once in that position, he was not trained or provided any guidance on what he was supposed to do.

313.    T. Mitchell asked his White lead man, Stenson, for some training, but Stenson refused to get in to the truck to train him.

314.    Not only did T. Mitchell have to figure out the job on his own, but he was provided with faulty equipment. He complained about the faulty equipment that caused him to have an accident to Joanne in Human Resources.

315.    After complaining, he was removed from the position and placed in the warehouse.

316.    A White employee replaced him in the driving position and was given better equipment.

317.    As a result of the continued discrimination and hostile work environment, T. Mitchell was constructively discharged in November 2012.  To the best of his knowledge, the White man who called him "Nigger" was still employed at the time.

**Delores Morgan**

318.    Delores Morgan ("Morgan") was employed by Defendants in Mt. Pleasant, Texas from August 6, 2012 to February 1, 2013.

319.    Morgan worked in De-bone and reported to a Hispanic and Black supervisor as she alternated between two lines.

320.    Hispanic employees generally received raises prior to working 90 days at the plant. However, Morgan and her Black co-workers did not receive raises until they had worked the full 90 days, if they received them at all.

321.    Morgan and her Black co-workers were also subjected to discrimination in terms of disciplinary procedures. For example, throughout her employment, Morgan was written up and singled out for missing bones when she worked in De-bone, but a Hispanic female on her line who had also missed bones was not written up.

322.    Black employees were also routinely placed or moved to wherever they were told by management, but Hispanic employees were allowed to pick and choose where they wanted to work. This gave the Hispanic employees a greater advantage with respect to raises, overall earnings, and promotional opportunity. This process was supported by the predominantly Hispanic management team.

323.    For example, after being employed with Defendants for about two months, Morgan was pulled off her job and reassigned to pulling chicken tenders. The nature of this job was particularly unpleasant and caused Morgan to lose her thumb nail and index finger nail.

324.    Morgan complained about the conditions to her supervisor, who was also Black, as well as the plant manager, who was Hispanic.

325.    Even after seeing the company nurse who suggested that Morgan be moved, she was told that she could not move. Whenever Hispanic employees wanted to be transferred or placed into a different position their requests were routinely granted.

326.    Morgan also requested to be transferred to Marking.

327.    After being employed for about four months, she was transferred to Marking but was quickly replaced by a Hispanic employee and placed back in De-bone. This was a typical practice impacting the Black workforce.

328.    During her employment at the plant, Morgan and her Black co-workers had to raise their hands to ask permission to use the restroom. This was demeaning and humiliating to the Black employees.

329.    Morgan and her Black co-workers were also subjected to racial graffiti in the bathrooms including "Niggers can't do the job," and "Nigger ain't better than me," and "Nigger."

330.    Morgan reported the racial graffiti to her supervisor and Human Resources.

331.    Both acknowledged that they had received several complaints about it and were going to look into it, but Morgan never heard back.

332.    Moreover, Defendants did not hold any meetings to address the racial graffiti or make any efforts to remove and prevent the graffiti.

333.    Morgan was also subjected to continuous sexual harassment. Specifically, on multiple occasions, a Hispanic male would take chicken and shape it in the form of a penis and cover it with a rubber sleeve to simulate a condom.  He would use other chicken parts to form testicles and breasts.

334.    On one occasion, a white female inspector saw this and asked who did it.

335.    Morgan informed the inspector who did it, but he was not removed.

336.    Morgan also reported this to her supervisor, but he remained.

337.    The same Hispanic employee who engaged in these overt sexual acts in front of Morgan also made inappropriate sexual advances towards her.

338.    He even showed Morgan a video on his cell phone of a man and a woman having sexual intercourse and told Morgan he was the male in the video and he wanted Morgan to "perform" like the female.  Morgan did not complain because nothing had been done about the other sexual acts so she did not think that anything would be done about this.

339.    Some female Hispanic employee on the De-bone line would tell Morgan that this Hispanic man wanted to have sex with her and would make overtly sexual hand gestures at Morgan.

## Dominique Smith

340.    Dominique Smith ("Smith") was employed by Defendants in Mt. Pleasant, Texas from November 9, 2011 to February 27, 2013.

341.    Smith began working on a line moving the meat off of the line and into a Combo. He reported to Gwen Jones.

342.    Smith and his Black co-workers would have their raises delayed or withheld while Hispanic employees typically received their raises prior to the completion of their probationary period.

343.    Throughout his employment, work assignments were sometimes segregated by race.  For example, if there was work to do outside in the heat, Smith and his Black co-workers would be assigned to do the work outside while his Hispanic co-workers worked on assignments inside.

344.    Throughout his employment, Smith's Hispanic co-workers and supervisors regularly spoke in Spanish so that Smith and his Black co-workers could not understand what was being said.  This led to Black employees missing important instructions and information.

345.    Smith was also discriminated against in terms of Defendants' disciplinary system. Part of Smith's job entailed loading combos on a truck.  One day, he went to see if the truck was there, and when he returned, his Hispanic lead man wrote him up because he had not asked permission to check if the truck was there.

346.    As a result, Smith was suspended for three days.

347.    Hispanic workers did not have to ask permission to do their jobs correctly.

348.    Throughout his employment, Smith and his similarly situated Black co-workers had to raise their hands to ask permission to use the restrooms.  Hispanic and White employees did not have to raise their hands to ask permission to use the restrooms and could leave their work lines to use the restrooms whenever they wanted to.

349.    When Black employees were given permission to use the restroom, they were often followed by a supervisor who would stand by the door.

350.     Hispanic supervisors Leo and Marco, along with Lorie, a White female supervisor, would follow Smith and other Black employees to the restroom.

351.    Smith and his Black co-workers were also threatened that if they did not return within five minutes they would be written up.

352.    Hispanic employees did not have any time limits on their restroom breaks.

353.    Throughout his employment, Smith and his Black co-workers were subjected to a hostile work environment.  Smith and other Black employees were subjected to racial slurs such as "Nigger," "That Nigger's stupid," and "why are Black men so lazy?"

354.    Sometimes the slurs were said in Spanish.  On one occasion, Smith was told that a Hispanic co-worker referred to him as a "monkey" in Spanish.

355.    There was also racially offensive graffiti in the restrooms including drawings of a Black person hanging by a noose with "Nigger" written below it.  There were also Nazi symbols drawn on the walls.

356.    Smith's co-worker complained about the graffiti, but nothing was ever done to address or remove it.

357.    Additionally, Smith left the plant one day while on his break.  Upon his return, Leo told Smith that Chris, a White superintendent, called Leo to tell him that Smith was on 1st street.  When Leo told Smith this, Smith told him that he was on his break.  Leo told him later that Smith did not have to worry about Chris trying to "get rid of him" because he quit to work at another plant.

358.    Smith and his Black co-workers were also subjected to lewd and physical types of harassment on account of their race.  For example,   Smith's male Hispanic co-workers would grab at his genitals and the genitals of his Black co-workers and say comments such as, "How much I pay for that?"

359.    Smith reported this to his Hispanic lead man, Louis, but even Louis observed this conduct and simply laughed about it.

360.    Smith's Black co-worker, Anthony, also reported this conduct to Human Resources. However, Human Resources did not take any action to stop the offensive touching. Anthony was terminated that day.  In fact, he did not even come back to the line at all after going to Human Resources to complain.

361.    Finally, Defendants' point system was also implemented in a discriminatory manner resulting in his eventual termination.

362.    Smith received points for absences that should have been excused due to medical necessity or other reasons.

363.    When Smith would complain about this practice and bring his documentation to Human Resources, nothing would be done to investigate the situation or remove the points that were incorrectly allocated to him.

364.    There were several Hispanic workers who would never receive points for taking time off work.  For example, Carlos was out of work for one month and did not receive any points for his absences.

365.    There were also some instances where points were allocated to Smith for no absences at all.  Smith had to regularly check whether this was done and sometimes those extra points were removed.

366.    Smith was terminated on February 27, 2013, for allegedly accumulating too many points even though he had excused absences that were not taken into consideration.

### Mickey Wise

367.    Mickey Wise ("Wise") began her employment with Defendants in Mt. Pleasant, Texas on August 5, 2011 and was terminated in or around the summer of 2013.

368.    Wise was hired into the De-bone department and reported to Jose, a Hispanic supervisor.

369.    In September 2012, Wise applied for a lead position in the De-bone department where she had been working for almost a year.

370.    Approximately once a week for the next two months, Wise visited a Hispanic assistant in Human Resources to inquire about the status of her application.

371.     In November 2012, the assistant informed Wise that her application had been "lost."

372.     In response, Wise submitted another application for the same position in December 2012, which was also subsequently "lost" according to the assistant.

373.     In January 2013, Wise learned that Mario, a Hispanic supervisor responsible for the promotion decision, had promoted Edith, a Hispanic worker to the lead position over Wise. Edith came from another department and had no experience working in the De-bone department.

374.     Wise later learned that a White superintendent, Chris McKinney, made a racist comment regarding her potential to succeed in the lead position.

375.     Upon information and belief, McKinney stated, in the presence of other supervisors and Mario from Human Resources, that Wise is "too ghetto to become a lead."

376.     In the winter of 2012, Wise was working on her line, encouraging her co-workers when Lupe, a Hispanic supervisor, told Wise that McKinney wanted to relay the message that Wise should "shut up" and that no one on the line was permitted to talk to her.

377.     During her lunch break that day, Wise complained to Roger Browning, Plant Manager, about McKinney's comments.

378.     Immediately after she spoke to Browning, Wise was called into the De-bone office where Browning and McKinney confronted her regarding her complaint.

379.     McKinney denied making the comments, no further action was taken to address her complaint, and Human Resources was not involved.

380.     On January 4, 2013, Wise submitted a request to Human Resources for two weeks of leave to be taken in April 2013. Although Wise submitted her request four months prior to the intended date of leave, her request was denied by Browning.

381.     Meanwhile, Wise witnessed two Hispanic co-workers of equal seniority and tenure, Marcela Morales and Maria Morales, receive more than two weeks of vacation time around the same time period.

382.     Throughout her employment, Wise and her Black co-workers were subjected to a hostile work environment including frequent racial slurs, such as "Nigger," "Niggers need to go back to Africa."

383.     The bathroom facilities were also riddled with racially offensive graffiti including, but not limited to, anti-Black slurs written in Spanish.

384.     Supervisors were aware of the openly hostile work environment, but did nothing to address it or the concerns of the many Black workers.

385.     Wise continued to work in the environment and due to the excessive and discriminatory points she received, Wise was terminated in the summer of 2013 for missing a day of work.

### JT Birdine

386.     JT Birdine ("Birdine") began his employment with Defendants in Mt. Pleasant, Texas on February 7, 1995.

387.     Birdine was initially hired to work in the production department as a bird hanger under Black supervisor, Bridget Rape.

388.      Birdine was then transferred to an operator position. He remained an operator from December 1995 until December 1999 under White supervisor, Jack Rose.

389.     Birdine was then transferred to the maintenance department, a position he held until he was wrongfully terminated on March 15, 2015. Birdine worked under White supervisors Kenneth Jenkins ("Jenkins"), Ronnie Way ("Way"), and Don Thong ("Thong").

390.    From the onset of his employment until his termination, Birdine recognized the difference in treatment he was receiving under multiple supervisors. For example, Jenkins would consistently assign substantially more work to Birdine than to his White co-workers.

391.    Birdine was also frequently radioed by Jenkins to clean up and fix the areas that were assigned to his White co-workers, Dan Patrick ("Patrick") and Lonnie Rushing ("Rushing").

392.    Birdine and his Black co-workers were subjected to a hostile work environment. For example, he and other Black employees were subjected to racially offensive graffiti in the restrooms, including drawings of Black people hung with nooses around their necks, the words "Go back to Africa niggers," "hang the nigger," and "niggers."

393.    Birdine was also discriminated against in terms of Defendants' disciplinary system. While he was working in the maintenance department, Birdine was twice suspended by White plant manager, Thong.

394.    In February 2015, Thong suspended Birdine after he failed to finish a welding job.
However, Birdine was unable to finish the job because the only available welding machine was being operated by his white co-worker, Rushing. Yet, Birdine was suspended for three (3) days without pay after Jenkins reported him to Thong.

395.    On March 3, 2015, Birdine was again suspended after being blamed for an injury suffered by a machine operator. Birdine explained that he had written on the daily logs for three (3) weeks that the machine was not working properly, and that all lead men were aware that there was a broken piece.

396.    Despite Thong stating that it was the fault of the entire maintenance department that the machine was operating incorrectly, Thong disciplined only Mr. Birdine by suspending him until further notice.

397.    No other maintenance employees were disciplined as a result of the workplace injury.

398.    Ultimately, Mr. Birdine was wrongfully terminated on March 15, 2015 by Joanie, a White human resources manager, as a result of this suspension.

**Darrell Brown**

399.    Darrell Brown ("Brown") was employed by Defendants in Mt. Pleasant, Texas from November 2007 to June 2012.

400.    Brown was assigned to the de-bone line. However, he was moved around so frequently within his first year that he also worked in the West Plant and the East Plant. Brown observed that Black employees were frequently moved around the Company without any explanation while Hispanic and White employees were not.

401.    Brown ultimately left his employment at the Company in 2008 as a result of this discriminatory practice.

402.    He then returned in 2009 as a live hanger/re-hanger in the prepared foods plant.

403.    Brown observed that Hispanic employees were given raises before Black employees.  It took Brown ninety (90) days before he received a raise, while his Hispanic co-workers received their raises in a much shorter time span.

404.    Brown and his Black co-workers were also subjected to disparate treatment in terms of discipline.

405.    For example, Brown once received points when he was forced to miss a work shift because he was in a car accident.  Despite providing a doctor's note to Mario, a Hispanic HR supervisor, yet he was still given disciplinary points.

406.    Brown observed that he and his Black co-workers were subjected to disparate treatment in terms of work assignments. In particular, his Hispanic co-workers frequently received overtime shifts.  However, when Brown requested overtime shifts, the lead men, who were primarily Hispanic males, would tell him that work was slow and there were no overtime shifts to be had.

407.    Brown also had frequent problems with his paychecks being incorrect. He consistently had to go to Human Resources to have the problems corrected, as it was never corrected despite his complaints.

**Larry Evans**

408.    Larry Evans ("Evans") began his employment with Defendants in Mt. Pleasant, Texas on April 8, 1986.

409.    Evans was hired into the production department as a laborer and held that position until 1992, at which time he became a production foreman. Evans then transferred to the maintenance department around 1998 as a maintenance mechanic. He remained in that position until he received a foreman position in that department in 2013.

410.    Shortly after Evans became a maintenance foreman, he was forced to step down to a mechanic position in order to escape the daily harassment by Raymond Towler ("Towler"), a White supervisor.

411.    Specifically, Towler harassed Evans on a daily basis telling him that he was a "shitty worker," attempting to humiliate him in front of co-workers, and complaining that he did

not know how to do his job despite his almost three decades of experience. Towler did not mistreat any of Evan's White co-workers.

412.   Evans filed a formal complaint with Joanie Worrell ("Worrell"), a White human resources manager, who indicated that she would investigate.

413.   During Evans' employment as a maintenance foreman, he was paid significantly less than the other three (3) foremen who were white.

414.   Evans and his similarly situated Black co-workers were also subjected to disparate work assignments.   In December 2013, Roy Huffman ("Huffman"), a White maintenance manager, transferred Evans from the day shift to the night shift without providing a reason. The Company then hired Jerry Mathews, a White male from outside the Company, to fill the open day shift position.  When Evans questioned why he was moved from the day shift to the night shift, Huffman responded, "You either take the night shift or you're getting laid off."

415.   Evans was also subjected to a racially hostile work environment wherein he was exposed to racially offensive graffiti in the bathrooms including comments such as, "Niggers die" and "Nigger." The racially offensive graffiti remained throughout his employment.

416.   Evans witnessed a drawing of a Black man with a noose around his neck with the word "Nigger" written below it in a restroom shared by both hourly employees and supervisors in January 2015.

**Marques Frederick**

417.   Marques Frederick ("Frederick") began his employment with Defendants in Mt. Pleasant, Texas in 2007.

418.   Frederick was hired to pull tender and cut shoulders. He remained in that position until he was moved to the fry line in 2009. Frederick is currently an employee on the fry line.

419.     Frederick and his Black co-workers are routinely subjected to discrimination in terms of promotions and pay raises.  Hispanic employees typically receive raises prior to working at Defendants' for ninety (90) days, but Frederick and his Black co-workers have to work ninety (90) days before they are even considered for raises.

420.     In March 2014, Mr. Frederick applied for a promotion to a flow mac operator position. Despite having seven (7) years of experience at the Company, a Hispanic employee who had only been with the company for three (3) months received the position.

421.     Frederick and his similarly situated Black co-workers are also subjected to disparate treatment with respect to discipline. Hispanic workers are not disciplined for acts that, if committed by a Black employee, would lead to discipline and/or termination. For example, Hispanic workers always throw chicken wings at the Black employees on the line.  Frederick and other Black employees constantly complain to various supervisors, but nothing is ever done.

422.     In addition, Frederick and his similarly situated Black co-workers are subjected to racially offensive graffiti. For example, Frederick would see words written on the bathroom walls and stalls such as, "Nigger."

423.     Throughout his employment, Frederick and his similarly situated Black co-workers have had to raise their hands to ask for permission to use the restrooms.

424.     Conversely, both Hispanic and White employees do not have to raise their hands to use the restrooms.  Black employees are routinely told that they cannot use the restrooms until their next break.  When Frederick complained to Mario, a Hispanic human resources manager, that his Hispanic line leader refused to allow him to use the restroom, Mario responded, "You'll have to wait until lunch, majority rules," inferring that only Hispanic employees were able to use the restrooms outside of the break period.

## Margaret Jiles

425.    Margaret Jiles ("Jiles") was employed by Defendants in the Mt. Pleasant, Texas facility from August 23, 2007 to December 2014.

426.    Jiles started her employment on the fry line before being transferred to the de-bone and DSI departments.

427.    When working at the plant, Jiles and her similarly situated Black co-workers were subjected to a racially hostile work environment. In particular, Jiles has a medical condition which requires her to use the restroom suddenly.  Jiles and other Black employees had to ask permission before using the bathrooms.  Hispanic and White employees typically left their work to use the restrooms without asking permission and were not disciplined for doing so.

428.    Despite informing her supervisors about her condition and providing them with a doctor's note, Jiles was still required to ask permission before using the restroom.

429.    In particular, Brian, a White supervisor, would routinely get angry and yell at Jiles for using the restroom.  White and Hispanic employees were not subjected to the same scrutiny.

430.    Jiles observed that her Black co-workers were also routinely placed or moved to various locations around the plant.  However, Hispanic employees were allowed to choose where they wanted to work.  This gave Hispanic employees a greater advantage with respect to raises and promotional opportunities.

431.    Jiles and her Black co-workers were also held to different standards and disciplined more harshly as compared to their Hispanic co-workers.  For example, when returning from break, Jiles and other Black employees were frequently disciplined for being one minute late.  Hispanic and White employees were allowed to take extended breaks while on the clock and were not disciplined for doing so.

432.     In 2012, Jiles was diagnosed with carpal tunnel syndrome and was required to wear hand braces.  As a result, she requested an accommodation that would not force her to put as much pressure on her hands.

433.     Instead of providing an appropriate accommodation, Mario, a Hispanic HR supervisor, and Chris McKinney, her White supervisor, both told her that the company does not provide light duty work.

434.     In turn, Jiles was placed on the de-bone line pulling chicken breast, which was a very painful task for her to do with her hand braces.

435.     When Jiles complained again, she was still not given light duty.  Instead, she was placed back in the DSI department.

436.     In June 2014, Jiles was forced to go out on medical leave after the Company refused to accommodate her.  Despite her doctor informing the Company that Jiles could work in a position that did not require her to be on her feet all day, the Company refused and instead terminated her in December 2014.

437.     Although the Company refused to give Jiles an accommodation, she routinely observed Hispanic employees being given special accommodations and placed in light duty positions upon request.

**Mary Leeks**

438.     Mary Leeks ("Leeks") began her employment with Defendants in Mt. Pleasant, Texas in October 2011.

439.     Leeks worked for the Defendants for one (1) month on the de-bone line before being wrongfully terminated on October 30, 2011.

440.   When she was hired, Leeks was told that she would receive a raise within the first two (2) weeks of her hire, but she never received one.

441.   However, Leeks observed a Hispanic co-worker, who began his employment the same time as her, receive a .50 cent raise within the first few weeks of employment.

442.   Leeks and her Black co-workers were discriminated against in terms of overtime. Leeks was never offered overtime during her employment with Defendants, and she observed that none of her Black co-workers were offered overtime either.

443.   Yet, during her employment with Defendants, every Hispanic employee on Leeks' line was offered overtime.

444.   Leeks and her Black co-workers were also subjected to a racially hostile work environment.  When Leeks, who is fluent in Spanish, went for her hiring interview, she overheard several Hispanic human resource employees speaking in Spanish. In addition to discussing that they were only hiring Black employees to meet a certain quota, Leeks heard one employee say, "I don't know why we are hiring them because they aren't going to work."

445.   When Leeks was in training for her position, the Hispanic woman training her said to another woman on the line, "Why did they put this nigger with me? I know she's not going to do her work." On another occasion, Leeks reached for a pair of scissors and the Hispanic woman next to her said in Spanish, "Why is this nigger touching my scissors?"

446.   When Leeks' Black co-workers discovered that Leeks could understand what their Hispanic co-workers were saying in Spanish, she was often asked to translate.  The most frequent words that she translated were "Nigger" "Fucking Nigger" and "Lazy Nigger."

447.    Leeks also observed racially offensive graffiti in the restrooms, including "nigger," "I don't want Black people here," and "Niggas are lazy." The graffiti remained in the restroom throughout her employment.

448.    During her employment, Leeks and her Black co-workers were discriminated against in regards to using the restrooms.  Black employees were required to ask for permission to use the restrooms.  On October 30, 2011 Leeks told a Hispanic co-worker on her line that she needed to use the restroom.  The Hispanic co-worker told Leeks that she could go.  When Leeks returned, her supervisor was infuriated.  Leeks was terminated that day.

449.    Hispanic employees, however, could leave the line to go to the restrooms without asking permission.

450.    In 2013, Leeks was still seeking employment and reapplied for a position with Defendants. Despite calling Human Resources to confirm that she could be re-hired, Defendants refused to give her an application when she arrived. White and Hispanic employees, however, have been re-hired by Defendants after they have been terminated.

**Martha Shepherd**

451.    Martha Shepherd ("Shepherd") began her employment with Defendants in Mount Pleasant, Texas on March 6, 1987.

452.    She was hired to work as a packer, and remained in that position for approximately one (1) year until she was placed in the de-bone department for the following two (2) years.  In or around 1990, Shepard was moved to the fry line, a position she would hold for approximately twenty (20) years.

453.    Following Pilgrim's buyout, Shepard was laid off and did not return to Pilgrim's until 2010, at which time she was placed in the de-bone department.  She was transferred to an auditor position in 2012, a position she currently holds.

454.    Shepard has observed that Black employees are treated differently than their Hispanic and White co-workers in regards to job assignments, promotions and transfers. Shepard and her Black co-workers are routinely placed or moved to new positions without their input or involvement.  Yet, Hispanic employees are allowed to pick where they wanted to work.

455.    Shepard has observed that Hispanic supervisors request and are provided with only Hispanic employees on their lines, while Black employees are routinely given the most difficult jobs, such as clipping and popping tenders.

456.    This practice gives Hispanic employees a greater advantage with respect to raises and promotional opportunity.   Shepard witnesses Hispanic and White employees receive promotions more frequently and more quickly than Black employees.

457.    In particular, Shepard has witnessed Hispanic employees regularly be provided with $30 for performing well on the job regardless of their actual performance, while Black employees are not given the same monetary bonus.

458.    Shepard and her Black co-workers are also subjected to discrimination in regards to disciplinary procedures.  For example, Hispanic employees were allowed to take extended breaks while on the clock.  Additionally, Hispanic employees were not disciplined when they ran bad product or miss-cut the chicken.

459.    However, Black employees would be disciplined if they returned just one minute late from break, even though they were off the clock.  If Shepard or another Black employee miss-cut chicken or ill-performed at work, they are sent home without pay or terminated.

460.     Additionally, Shepard and her Black co-workers had to raise their hands to ask permission to use the restroom while Hispanic and White workers are not required to do so.

**Ellich Williams**

461.     Ellich Williams ("E. Williams") has been employed by the Defendants in Mt. Pleasant, Texas since October 17, 2012.

462.     E. Williams began his employment on the trim line separating breast meat. He remained in that position for approximately two (2) months until he was transferred to the fry line.

463.     He remained on the fry line for approximately eight (8) months until he was transferred to the packing line in or around March 2013. E. Williams continues to be employed on the packing line.

464.     E. Williams and his Black co-workers were subjected to disparate treatment in the workplace. More specifically, E. Williams and his Black co-workers were routinely placed, moved, or transferred by management without their input or involvement.

465.     E. Williams observed that Black employee were consistently transferred from lines in order to maintain all Hispanic lines. Hispanic employees were rarely moved or transferred, unless the transfer or new position came with a pay raise or superior working conditions.

466.     E. Williams and his Black co-workers were subject to disparate treatment with respect to discipline. For example, Renee Martinez ("Ms. Martinez"), a White woman, and Marion (last name unknown), a Hispanic woman, would not receive points when they called out of work and/or took multiple cigarette breaks against Company policy.

467.    However, if E. Williams or his Black co-workers call out of work or leave the line

for a break, they either receive a point or are terminated.

468.    E. Williams and his Black co-workers are also subjected to a racially hostile work

environment.   For example, E. Williams would see pictures and drawings in the cafeteria

bathrooms of Black people being hung and words or phrases such as, "Black men aren't good"

and "Nigger" plastered on the stalls.

469.    Despite employees formally complaining about these racially derogatory images

and phrases, they remained uncorrected for weeks at a time.

## Jewel Williams

470.    Jewel Williams ("J. Williams") began her employment began her employment

with Defendants in Mt. Pleasant, Texas in May 2009.

471.    J. Williams left Pilgrim's in November 2010 after being falsely accused of sexual

harassment.  She then returned to Pilgrim's on February 10, 2012 and continues to be employed

there as a tender cutter.

472.    J. Williams and her Black co-workers are repeatedly held to different standards

and disciplined more harshly compared to their Hispanic co-workers.   For example, when

working in the plant, J. Williams and her black co-workers are required to ask permission to use

the restrooms.  Yet, Hispanic and White employees can leave the work lines to use the restrooms

without asking permission and are not written up for doing so.

473.    In particular, J. Williams once asked Rocindo, a Hispanic supervisor, to use the

restroom.  Rocindo refused to give her permission.  As a result, J. Williams was forced to go

without permission and when she returned Rocindo threatened to write her up if she left again. J.

Williams witnessed several female Black employees have accidents while working because of this discrimination.

474.     In June 2015, J. Williams was forced to ask the plant manager, Mr. Ellis, to use the restroom after her lead man, Poncho, refused to allow her to leave the line.   While J. Williams was told that Poncho's refusal would be investigated, no corrective action has yet been taken.

475.     J. Williams and her Black co-workers are also subjected to discrimination in terms of pay raises.  J. Williams observed that Hispanic employees are given raises before Black employees receive them.

476.     For example, J. Williams was hired at $8.00 per hour, and was told that she would receive a raise up to $10.19 after ninety (90) days.  While J. Williams received her raise after the full ninety (90) days, she witnessed her Hispanic co-workers receive their raises much sooner, typically within three (3) weeks of being hired.

477.     J. Williams and her Black co-workers are also subjected to sexual harassment and discriminatory discipline practices.   In 2010, J. Williams was falsely accused of sexual harassment by Mario, a Hispanic HR supervisor.

478.     Despite repeated denials, J. Williams was forced to sit in a hallway while the Company spoke to an alleged witness.  She was ultimately told that she was no longer suspected of sexual harassment.

479.     At the same time, J. Williams has repeatedly witnessed Hispanic supervisors sexually harassing Black employees by touching them and rubbing against them without being disciplined. J. Williams also observed Rocindo take a dismembered chicken and make it look like a penis.

## CAUSES OF ACTION

### <u>Count I</u>

### DISPARATE TREAMENT DISCRIMINATION
### (INTENTIONAL DISCRIMINATION) ON ACCOUNT OF RACE

*Title VII and 42 U.S.C. § 2000e et. seq. of the Civil Rights Act of 1964, as amended and
42 U.S.C §2000e et. seq.*

480.     Each Plaintiff is a member of a protected class and repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

481.     The conduct alleged herein violates Title VII and 42 U.S.C. § 2000e et. seq. as Defendants have engaged in the practice of discrimination against the Plaintiffs named herein who have asserted such claims.

482.     The conduct alleged herein violates Title VII and 42 U.S.C. § 2000e et. seq. as Defendants have engaged in the practice of discrimination with respect to the terms and conditions of Plaintiffs' employment.

483.     Plaintiffs' requests for relief are set forth below.

### <u>Count II</u>

### DISPARATE IMPACT DISCRIMINATION ON ACCOUNT OF RACE

*Title VII and 42 U.S.C. § 2000e et. seq. of the Civil Rights Act of 1964, as amended and
42 U.S.C §2000e et. seq.*

484.     Each Plaintiff is a member of a protected class and repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

485.     The conduct alleged herein violates Title VII and 42 U.S.C. § 2000e et. seq. as Defendants have implemented policies and practices relating to hiring, job placement, pay,

discipline, advancement and termination, which despite the appearance of neutrality have a disparate impact on the Plaintiffs named herein who have asserted such claims.

486.    Plaintiffs' requests for relief are set forth below.

## Count III

### SYSTEMATIC HOSTILE WORK ENVIRONMENT ON ACCOUNT OF RACE

*Title VII and 42 U.S.C. § 2000e et. seq. of the Civil Rights Act of 1964, as amended and 42 U.S.C §2000e et. seq.*

487.    Each Plaintiff is a member of a protected class and repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

488.    The conduct alleged herein violates Title VII and 42 U.S.C. § 2000e et. seq. as Defendants have engaged racial harassment and have created, maintained and condoned a hostile work environment with respect to the Plaintiffs named herein who have asserted such claims.

489.    Plaintiffs' requests for relief are set forth below.

## Count IV

### DISPARATE TREAMENT DISCRIMINATION (INTENTIONAL DISCRIMINATION) ON ACCOUNT OF RACE

*42 U.S.C. § 1981 et seq., as amended and 42 U.S.C. § 1981a et seq., as amended*

490.    Each Plaintiff is a member of a protected class and repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

491.    The conduct alleged herein violates 42 U.S.C. § 1981 et. seq. and 42 U.S.C. § 1981a et. seq. as Defendants have engaged in the practice of discrimination against the Plaintiffs named herein who have asserted such claims.

492.    The conduct alleged herein violates 42 U.S.C. § 1981 et. seq. and 42 U.S.C. § 1981a et. seq. as Defendants have engaged in the practice of discrimination with respect to the terms and conditions of Plaintiffs' employment.

493.    Plaintiffs' requests for relief are set forth below.

## Count V

### DISPARATE IMPACT DISCRIMINATION ON ACCOUNT OF RACE

*42 U.S.C. § 1981 et seq., as amended and 42 U.S.C. § 1981a et seq., as amended*

494.    Each Plaintiff is a member of a protected class and repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

495.    The conduct alleged herein violates 42 U.S.C. § 1981 et seq., as amended and 42 U.S.C. § 1981a et seq., as amended, as Defendants have implemented policies and practices relating to hiring, job placement, pay, discipline, advancement and termination, which despite the appearance of neutrality have a disparate impact on the Plaintiffs named herein who have asserted such claims.

496.    Plaintiffs' requests for relief are set forth below.

## Count VI

### SYSTEMATIC HOSTILE WORK ENVIRONMENT ON ACCOUNT OF RACE

*42 U.S.C. § 1981 et seq., as amended and 42 U.S.C. § 1981a et seq., as amended*

497.    Each Plaintiff is a member of a protected class and repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

498.    The conduct alleged herein violates 42 U.S.C. § 1981 et seq., as amended and 42 U.S.C. § 1981a et seq., as amended, as Defendants have engaged racial harassment and have

created, maintained and condoned a hostile work environment with respect to the Plaintiffs named herein who have asserted such claims.

499.     Plaintiffs' requests for relief are set forth below.

## Count VII

### RETALIATION

*Title VII and 42 U.S.C. § 2000e et. seq. of the Civil Rights Act of 1964, as amended and 42 U.S.C §2000e et. seq.*

500.     Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

501.     Plaintiffs lodged complaints on behalf of themselves or others with Defendants regarding discrimination and/or the hostile work environment to which they or other employees were subjected, and as such engaged in protected activity under Title VII and 42 U.S.C. § 2000e et. seq. of the Civil Rights Act of 1964, as amended and 42 U.S.C §2000e et. seq.

502.     Defendants retaliated against said Plaintiffs.

503.     Plaintiffs' requests for relief are set forth below.

## Count VIII

### RETALIATION

*42 U.S.C. § 1981 et seq., as amended and 42 U.S.C. § 1981a et seq., as amended*

504.     Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

505.     Plaintiffs lodged complaints on behalf of themselves or others with Defendants regarding discrimination and/or the hostile work environment to which they or other employees were subjected, and as such engaged in protected activity under 42 U.S.C. § 1981 et seq., as amended and 42 U.S.C. § 1981a et seq., as amended.

506.    Defendants retaliated against said Plaintiffs.

507.    Plaintiffs' requests for relief are set forth below.

## Count IX

### EMPLOYMENT DISCRIMINATION ON THE BASIS OF SEX

*Title VII and 42 U.S.C. § 2000e et. seq. of the Civil Rights Act of 1964, as amended and 42 U.S.C §2000e et. seq.*

508.    Plaintiffs incorporate by reference the allegations set forth throughout this Complaint.

509.    Plaintiffs were subjected to discrimination on account of their gender/sex.

510.    The conduct alleged herein violates Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), as the Defendants have engaged in the practice of discrimination based on gender/sex against the Plaintiffs Antoinette Brown, Cheryl Lane, Crystal Lane, Carla Mason, Maranda McCulloch and Delores Morgan, Margaret Jiles, and Jewel Williams.

511.    Plaintiffs' requests for relief are set forth below.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves, pray for the following relief:

1.    That the practices of the Defendants complained of herein be determined and adjudged to be in violation of the rights of the Plaintiffs under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981 *et seq*., as amended, and 42 U.S.C. § 1981a *et seq*., as amended, prohibiting discrimination and retaliation in employment;

70

2.      That judgment be entered in favor of Plaintiffs against Defendants for back pay (including interest or an appropriate inflation factor), front pay, benefits and all other amounts owed to Plaintiffs;

3.      That the Plaintiffs be awarded compensatory damages where available;

4.      That the Plaintiffs be awarded punitive damages;

5.      That the Plaintiffs be awarded pre and post judgment interest;

6.      That the Court award Plaintiffs attorneys' fees and costs associated with this matter, including but not limited to expert fees' and costs;

7.      That the Court retain jurisdiction over Defendants until such time as it is satisfied that it has remedied the practices complained of and is determined to be in full compliance with the law;

Plaintiffs seek injunctive relief, and including but not limited to:

a.      Training on the subject of employment discrimination for all Pilgrim's and JBS employees;

b.      Diversity training for all managers conducted by reputable outside vendors;

c.      Supervisory discipline up to and including termination for any supervisor who engages in unlawful discrimination;

d.      Active monitoring of the work areas to ensure compliance with discrimination policies;

e.      All promotional opportunities posted on all employee bulletin boards; and

f.      Monitoring by the Court of a Federal Agency to ensure that Defendants comply with all injunctive relief; and

Plaintiffs further demand that they be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Respectfully submitted,

Eric M. Albritton
Texas State Bar No. 00790215
ema@emafirm.com
Michael A. Benefield
Texas State Bar No. 24073408
mab@emafirm.com
**ALBRITTON LAW FIRM**
P.O. Box 2649
Longview, Texas 75606
Telephone:  (903) 757-8449
Facsimile:  (903) 758-7397

Jay D. Ellwanger
Texas State Bar No. 24036522
jellwanger@dpelaw.com
**DiNovo Price Ellwanger& Hardy LLP**
7000 North MoPac Expressway, Suite 350
Austin, Texas  78731
Telephone: (512) 539-2626
Facsimile: (512) 539-2627

James A. Vagnini
N.Y. State Bar No. 2958130
jvagnini@vkvlawyers.com
**Valli Kane &Vagnini, LLP**
600 Old Country Road, Suite 519
Garden City, New York 11530
Telephone: (516) 203-7180
Facsimile: (516) 706-0248

***Counsel for Plaintiffs***